378 A.2d 936

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**Manly BANKS and Barbara Greer.**

Superior Court of Pennsylvania.

Submitted Nov. 8, 1976.

Decided Oct. 6, 1977.

Robert L. Eberhardt, Charles W. Johns, and Louis R. Paulick, Assistant District Attorneys, Pittsburgh, for Commonwealth, appellant.

Bruce A. Carsia and John J. Cohen, Pittsburgh, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

VAN der VOORT, Judge:

The instant appeal has been taken by the Commonwealth from an Order granting a defense motion to suppress all physical evidence obtained for use against the appellees in criminal proceedings.[1] After a thorough review, we find the arguments raised by the Commonwealth to be meritorious and reverse the Order of the lower court.

The record shows that on September 21, 1975, at approximately 3:30 a. m., an officer of the Pittsburgh Police Department was conducting surveillance at the Loendi Club on Ledlie Street in Pittsburgh, and observed patrons entering and leaving the club after the legal closing time. The officer had been instructed by his superiors to observe activity at the club and ascertain if certain people, for whom police had search or arrest warrants, were entering the club. During his surveillance the officer observed appellee Banks arrive in a clean, shiny, green 1974 Cadillac and enter the club. Approximately one-half hour later, Banks exited the club and entered the car, remaining there for a short period of time; thereafter he returned to the club. At about 5:30 a. m., the club was raided by police, and Banks along with other patrons was arrested on a charge of visiting a disorderly house. While being transported from the Loendi Club to the Public Safety Building, Banks and another man forced open the rear exit door of the police bus, jumped out and escaped. Not long after, at about 6:30 a. m., or 7:00 a. m., while police were still at the club awaiting warrants to search vehicles outside the club, appellee Banks with Greer as his passenger drove on Ledlie Street past the police at the

---

1. The Commonwealth alleged great prejudice, in both the lower court and before our Court, as a result of the suppression order. Since all evidence was suppressed, the Commonwealth was "substantially handicapped" in its prosecution and the order of suppression is properly appealable by the Commonwealth. See *Commonwealth v. Bosurgi*, 411 Pa. 56, 190 A.2d 304 (1963).

club. He was driving a Chevrolet, and one of the officers on the scene identified him as he drove by. This officer advised the other officers of Bank's identity and the fact that he had escaped from the police bus. Farther down the street, but in the clear view of the officers, appellee Banks stopped the Chevrolet and appellee Greer got out of the passenger side. She got into the green Cadillac Banks had earlier driven to the club. Both Banks and Greer then drove the two cars down to the next street, apparently not knowing that it was a dead-end street and provided no outlet from Ledlie Street.

The police on the scene, including the officer who conducted the original surveillance were at that time still at the site awaiting the arrival of a superior officer who was to deliver warrants previously issued for the search of vehicles of several of the club patrons who had been arrested. Just after Banks and Greer had driven down the street and turned the corner, the officer arrived with the warrants. He left his car in the middle of narrow Ledlie Street. Just after that, apparently finding no outlet, the appellees drove back up Ledlie Street, with Greer, driving the Cadillac, in the lead.

The two cars were forced to stop as a result of the position of the parked police car. Appellee Greer stopped the Cadillac just beside the officer who had initiated the surveillance earlier that morning. The latter recognized the Cadillac as the automobile he had first seen driven by the appellee Banks when he had first arrived at the after-hours club. The officer was standing about one and a half feet from the passenger-side window of the Cadillac when he saw the butt end of a revolver sticking out from the front seat armrest which was down. He shouted to a fellow policeman, who was on the other side of the car, that there was a gun on the seat. That officer opened the driver-side door and hit an electric door unlock button. The first officer then opened the other door and pulled out the gun. While pulling out the gun, he noticed a brown paper bag which had been under the armrest. Protruding from the bag was a rolled cigarette, which, based upon his past experience, appeared to

him to be a marijuana cigarette. Opening the bag, he found other items of contraband, including heroin and cocaine. Appellee Greer was arrested and appellee Banks was re-arrested.

It was the claim of the appellees that the initial stop and subsequent search and arrests in this case were without probable cause. We find the contrary to be true. The appellees came to a stop only because they could not pass a police car parked in their path. There is not a scintilla of evidence to suggest that the police car was thus parked by the officer as a roadblock for appellees' cars. Moreover, if such evidence were present, we would hold such conduct proper in view of the totality of circumstances then apparent to the police on the scene. Appellee Banks was known to be a recent escapee from custody following the raid on the club. His companion, Greer, was assisting him in the removal of his car from the scene of the arrest. When, in the course of such events, an officer spotted the gun, in plain view in the Cadillac, the police were completely justified in entering the car to prevent its use in furtherance of the appellees' attempts to avoid a re-arrest of Banks. The discovery of the suspected narcotics in the course of these activities suggests no impropriety by the officers.

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972). The instant situation is somewhat akin to a stop and frisk situation where the officer has power to act where he observes ". . . unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous . . ." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968); *Commonwealth v. Pollard*, 450 Pa. 138, 299 A.2d 233 (1973). In the case of a vehicle stop and search, probable cause exists when the officer is possessed of information

which creates a reasonable suspicion that the detained motorist is involved in criminal activity. *Commonwealth v. Ferraro*, 237 Pa.Super. 268, 352 A.2d 548 (1975); *Commonwealth v. Nastari*, 232 Pa.Super. 405, 335 A.2d 468 (1975). As recited above, the officer saw the Cadillac stop beside him as a result of its inability to pass a parked police car. He knew that it was driven to the scene by an individual who had a short time before escaped from police. The woman driver had accompanied this escapee back to the scene of his arrest to get his vehicle, probably to further assist and facilitate his continued evasion of arrest. In plain view, at that time, the officer saw a gun within the reach of the Cadillac's driver. Based upon these facts there was clearly probable cause to act in the manner the police did and enter the Cadillac to seize the weapon and .detain and then arrest the driver. Of course, knowing that the driver of the next car was at that time a fugitive, there was certainly probable cause to arrest him. All of these facts completely justified the reasonable belief that criminal activity was afoot at the time a probable cause existed to support the conduct of the police.

Reversed and remanded for trial.

SPAETH, J., files a dissenting opinion in which HOFFMAN, J., joins.

SPAETH, Judge, dissenting:

The officer who conducted the search of the green Cadillac testified that appellee Greer, "driving the green Cadillac belonging to [appellee] Banks, stopped directly in front of me. I was on the passenger's side." Record 31a. The officer's testimony continued:

Q. Why did that car stop, if you know?
A. Couldn't get through due to the fact that the street was blocked by police cars. *Id.*

The officer went on to say that when the car stopped he was "[s]tanding right beside it", Record 31a, and that he "looked right in through the window:"

Q. Did you see anything?

A. I seen the butt end of a revolver sticking out from the armrest which was down.

Q. What did you do then?

A. . . . . I reached in and picked up the armrest and pulled out the gun.

Q. Did you see anything as you were pulling the gun out?

A. Yes. Under the armrest a flat bag, brown paper bag. Protruding from the open end of the brown paper bag to the front end of the car was an unmarked cigarette, rolled cigarette with the end folded.

Q. Was there anything else there? Any vegetable matter?

A. Yes, I picked up the bag with the cigarette protruding from it, suspecting that this cigarette was possible marijuana. Opened the bag to look for more and inside I found other items of contraband I felt very strongly were narcotics.

Record 31a–33a.

### 1

Perhaps the gun and marihuana cigarette *were* in plain view. The majority says they were; it simply paraphrases the testimony just quoted as though it recited fact. At 282–284. It is possible, however, at the very least, that the hearing judge did not believe the testimony, for he suppressed the evidence. The judge may have believed that the gun and marihuana cigarette were in fact hidden, and were not found by the officer until after a search of the car. The officer's credibility was called into question on cross-examination, Record 54a–57a, and was uncorroborated since the other officer present when the gun and marihuana cigarette were found was never called.

### 2

Even if the gun and marihuana cigarette were in plain view, the question remains whether the officer had a right

to be in such a position as enabled him to see them. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The answer to this question depends upon the answer to the question whether the police were entitled to stop the green Cadillac.

The majority says that "[t]here is not a scintilla of evidence to suggest that the police car was thus parked . . as a roadblock . . . ." At 284. I find myself unable to join in this statement, given the officer's testimony, quoted above, that "[the green Cadillac] [c]ouldn't get through due to the fact that the street was blocked by police cars." It is true that the Commonwealth *claims* that there was no roadblock; that is quite different, however, from saying that there is no *evidence* of a roadblock.

If the majority means to say that *as it reads the evidence, it* finds that there was no roadblock, I can only note that the hearing judge may very well have believed that there *was* a roadblock, as may be seen from the following exchange between the judge and the officer:

THE COURT: Why did you stop Mrs. Greer? She was not a fugitive for [*sic*] justice? You never even saw her before.

THE WITNESS: That's correct, sir. I did not stop her. She had to stop because she couldn't proceed any further. It was not a roadblock, just a coincidence that the police car had drove up and Officer—and the Inspector was in the process of instructing us here on the warrants and—

THE COURT: He just happened to stop there?

THE WITNESS: He wasn't even paying any attention to this car.

THE COURT: Did anybody give Inspector Moore a ticket for parking in the middle of the street?

THE WITNESS: No, sir.

THE COURT: They did not?

THE WITNESS: No.

THE COURT: Okay.

Record 64a–65a.

3

Finally, the majority says that

> [If] such evidence [*i. e.*, evidence of a roadblock] were present, we would hold such conduct proper in view of the totality of circumstances then apparent to the police on the scene. Appellee Banks was known to be a recent escapee from custody following the raid on the club. His companion, Greer, was assisting him in the removal of his car from the scene . . . .

At 284.

Again, this statement of the facts resolves in favor of the Commonwealth an issue of credibility that the hearing judge may well have resolved against the Commonwealth.

The search of the green Cadillac was conducted by Officer Dukes. He acknowledged that he had not seen appellee Banks arrested, and had not seen his escape. Record 24a, 46a. He also acknowledged that he had never seen appellee Greer before, and did not know her. Record 52a. Therefore, as far as Officer Dukes—the searching officer—is concerned, this testimony contradicts the majority's statement that "[a]ppellee Banks was known to be a recent escapee . . . ."

At another point in his testimony, however, Officer Dukes said that Officer Hough and Officer DeFazio had told him that "[appellee] Banks, with another man, forced open the rear or back exit door of the bus . . . [a]nd he jumped out of the bus and made good his escape from custody." Record 30a. Officer Dukes was then asked whether he had this information when appellee Banks drove by in the blue Caprice, with appellee Greer beside him, about 6:30 a. m. or 7:00 a. m., and he replied, "That's correct. In that time." *Id.* If this testimony is accepted, then the majority's statement, that appellee Banks was known to be a recent escapee when the police stopped his green Cadillac, may also be accepted. However, the hearing judge may not have accepted the testimony. Officer DeFazio was called. Not only did he not say that he had told Officer Dukes about appellee Banks being a recent escapee; he said that he was not even

on the scene when the green Cadillac was searched, but was down at the police station making out arrest reports. Record 79a–80a. Officer Hough was also called. He did say:

I had told Officer Dukes that the man driving the vehicle that had just passed me with a woman was a man that jumped out of the rear of the bus.

Q. Now, what kind of a vehicle was it?

A. That was a blue Caprice.

Record 70a.

However, it appears that this statement was not made—or at least may not have been made—by Officer Hough to Officer Dukes until *after* the green Cadillac had been stopped. Thus, on cross-examination Officer Dukes was asked:

Q. And do you remember making the statement [at an earlier hearing at City Court] that *when the car stopped and that when you observed the butt of the gun*, what you believed to be a gun, that Officer Hough *at the time* was behind you and he said the guy behind her is the one who escaped from the bus? Do you remember making that statement?

A. Yes, I possibly could have made that statement. I can't remember it as an exact statement but I probably made that statement.

Record 56a (emphasis added).

4

On an appeal by the Commonwealth from an order granting a motion to suppress, it is not the function of this court to read the evidence de novo and resolve every issue of credibility in the Commonwealth's favor. Particularly is this so when it is evident that the hearing judge did not believe all the Commonwealth's witnesses said. It would have been good practice for the hearing judge to have made specific findings of fact; and certainly he should have given us the benefit of a written opinion. Since the judge did neither, I would retain jurisdiction and defer decision until we had received his findings and opinion. That is what the

290

Supreme Court does. *See Commonwealth v. Wright,* 472 Pa. 524, 372 A.2d 812 (1977).

HOFFMAN, J., joins in this opinion.