## Commonwealth *v.* Ferraro, Appellant.

270

Submitted June 16, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Clarence D. Bell, Jr.,* for appellant.

*Jeffrey P. Garton,* Assistant District Attorney, *Stephen B. Harris,* First Assistant District Attorney, and *Kenneth G. Biehn,* District Attorney, for Commonwealth, appellee.

OPINION BY CERCONE, J., December 1, 1975:

Appellant, Richard Ferraro, was arrested on August 19, 1971, and charged with larceny of an automobile and possession of burglary tools. Following the denial of his pre-trial motion to suppress evidence, appellant was found guilty in a non-jury trial of both charges. Post-trial motions were denied and appellant was sentenced to serve a three-to-six month term of imprisonment. This appeal followed.

The sole issue properly preserved for our review[1] raises the legality of appellant's arrest. Appellant argues that his arrest was illegal and that the physical evidence seized incident to that arrest should have been suppressed. We disagree.

The relevant facts are as follows: On August 19, 1971, at approximately 1:15 a.m., a 1971 yellow and gold Cadillac automobile was stolen from an apartment complex located in Bensalem Township, Bucks County. The owner of the vehicle, alerted by the sound of the engine being started up, observed her car being driven away and immediately telephoned the Bensalem Township Police. Moments later, a Bensalem Township police officer, William Thompson, received a radio bulletin that the Cadillac had been stolen from an address located less than one mile from his present position. Due to road construction, Officer Thompson had to proceed east on Grant Avenue in Philadelphia in order to reach the Bensalem Township address. While driving east on Grant Avenue, Officer Thompson observed the described Cadillac in the west bound lane. Officer Thompson then made a U-turn to investigate further. This investigation was

---

1. Appellant has also submitted two other assignments of alleged error for our consideration. Neither of these contentions, however, were raised in the lower court and are therefore deemed waived for purposes of appellate review. *Commonwealth v. Reid*, 458 Pa. 357 (1974); *Commonwealth v. Clair*, 458 Pa. 418 (1974); *Commonwealth v. Agie*, 449 Pa. 187 (1972).

hampered, however, by a 1971 Lincoln Continental automobile, operated by appellant, which was "tailgating" the Cadillac. The proximity of the Lincoln to the Cadillac ("maybe a half a car length") made it impossible for Officer Thompson to check the registration number of the Cadillac. When the Cadillac stopped for the traffic light at the Frankford Avenue intersection, Officer Thompson pulled alongside. He noticed that the lock cylinder on the driver's door of the Cadillac had been removed. The operator of the Cadillac, Thomas DiCicco, Jr., was placed under arrest.

In the meantime, a Philadelphia policeman, Officer Hughes, had observed Officer Thompson travelling east on Grant Avenue. Following Thompson, Hughes also made the U-turn and pulled alongside the Lincoln which was stopped behind the Cadillac at the traffic light. Officer Thompson alerted Officer Hughes that the Cadillac had been stolen and requested him to "cover" the Lincoln while he was securing the driver of the Cadillac. At the direction of Officer Hughes, who had drawn his service revolver, appellant turned off the ignition and alighted from the Lincoln. As appellant stepped out of the Lincoln, Officer Hughes observed in plain view on the front seat, a vise grip wrench and an open tote bag from which were dangling a "bunch" of car key blanks. Further examination of the tote bag revealed that it contained additional car key blanks, a pair of cutting pliers, a key-making device, a tool fitting the rear of an ignition lock, and a flashlight. A body search incident to appellant's arrest disclosed two automobile lock cylinders.

The Commonwealth, although conceding that probable cause did not exist for appellant's arrest at the time he was ordered to exit from the Lincoln, contends that the subsequent events, in plain view of Officers Thompson and Hughes, established probable cause for appellant's arrest. For the reasons set forth below, we agree.

It is well settled that: "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams,* 407 U.S. 143, 145 (1972). Indeed, it is quite clear that a police officer is justified in making a reasonable investigatory stop of a suspicious individual "in order to determine his identity or to maintain the status quo temporarily while obtaining more information. . . ." *Id.* at 146. A police officer's authority to "stop and frisk" a citizen is predicated upon his observation of "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person (s) with whom he is dealing may be armed and presently dangerous. . . ." *Terry v. Ohio,* 392 U.S. 1, 30 (1968). See also *Commonwealth v. Pollard,* 450 Pa. 138 (1973). Furthermore, in order to justify a "stop and frisk" the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. See *Adams v. Williams,* supra; *Terry v. Ohio,* supra; *Commonwealth v. Boyer,* supra. "Thus is it also clear that an investigative stop of a moving vehicle, to be valid, must be based upon objective facts creating a reasonable suspicion that the detained motorist is presently involved in criminal activity." *Commonwealth v. Murray,* 460 Pa. 53, 61, 331 A.2d 414, 418 (1975). See also *Commonwealth v. Nastari,* 232 Pa. Superior Ct. 405, 335 A.2d 468 (1975).

Application of the foregoing principles to the case at bar leads us to conclude that the investigatory stop of appellant was lawful in light of the attendant circumstances. As the court below stated:

"Officer Thompson knew that a car with the unusual yellow and gold characteristics of the subject

Cadillac had been stolen only minutes before from a location only a short distance away and from the direction of which the suspect vehicle was proceeding. He unquestionably, therefore, had probable cause to pursue, stop and apprehend the operator of the Cadillac. In the course of so doing, he became aware of additional circumstances which gave him not unreasonable grounds for at least suspicion that possibly the operator of the closely following Lincoln was also involved. Additionally, both he and Officer Hughes of the Philadelphia police department (in whose bailwick (sic) these vehicles were then being operated) personally observed the driver of the Lincoln committing a violation of the summary provisions of § 1010 of the Vehicle Code, as amended 75 P.S. § 1010, which prohibit an operator from following more closely than is reasonable and proper."[2]

The lower court properly concluded that the unusual manner in which the Lincoln was being operated at this early morning hour created a reasonable suspicion that it was also involved in the criminal activity that was being investigated. Here, we have an officer in a marked police vehicle responding to a stolen car report when he observes what appears to be the subject automobile travelling in the opposite direction being closely followed by another automobile. When the officer makes a U-turn and attempts to check the license number of the subject vehicle he finds his efforts thwarted by appellant's intervening automobile for a span of 200 yards. In the words of Officer Thompson:

"The Lincoln seemed to be tailgating the Cadillac, stopping, making it impossible for me to get behind the Cadillac to get the registration." Officer Thompson

---

2. The fact that appellant was not stopped or arrested for tailgating does not detract from or affect the paramount issue of whether Officer Thompson's suspicion—that the operator of the Lincoln (appellant) was possibly involved in criminal activity—was a reasonable one.

also testified that when he first sighted the automobiles the Lincoln was a car length or two behind the Cadillac, but after he made a U-turn and began following the vehicles the distance between the Cadillac and Lincoln narrowed even further. Likewise, Officer Hughes testified that following the U-turn the Lincoln pulled up extremely close to the rear of the Cadillac.

We find that these facts constituted sufficient unusual conduct to justify a reasonable suspicion on the part of an experienced police officer that criminal activity was possibly afoot.

Accordingly, adequate grounds existed for temporarily detaining appellant for investigation. Moreover, we do not believe that simply because Officer Hughes drew his service revolver while directing appellant to alight from the Lincoln turned this investigatory stop into an arrest. As the Fifth Circuit Court of Appeals has observed: "It does not seem to us that, without regard to motive, solely because an officer draws his weapon, an investigatory stop is turned into an arrest. To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)." *United States v. Maslanka,* 501 F.2d 208, 213 at n. 10 (5th Cir. 1974). Instantly, in view of the late hour of the night and the serious nature of the crime under investigation, we think the officer was justified in taking appropriate measures to protect himself. And, although an arrest can be effected without formal words of arrest, in the circumstances of this case, the absence of such words indicate that appellant was initially detained merely for investigative questioning. See *United States v. Richards,* 501 F.2d 1025 (9th Cir. 1974).

Since the investigatory stop was lawful it follows that the officers had the right to be in the position from which they observed the vise grip wrench and the car key blanks

in plain view on the front seat of the Lincoln. See *Commonwealth v. Nastari*, supra. After observing these items, in conjunction with all the other attendant circumstances, probable cause then existed for appellant's arrest; and, therefore, the more complete search of his person and automobile incident to that arrest was lawful. *Adams v. Williams*, supra; *Commonwealth v. Nastari*, supra.

Judgments of sentence affirmed.

---

DISSENTING OPINION BY HOFFMAN, J.:

Appellant contends that he was arrested illegally and that evidence seized pursuant to that arrest should have been suppressed.

In the early morning hours of August 19, 1971, a resident of Bensalem Township, Bucks County, heard someone start her new Cadillac. She arrived at an open window in time to see the car being driven away and notified the Bensalem Township police immediately.

Shortly thereafter, at 1:20 a.m., Officer William Thompson received a radio alert that a 1971 Cadillac had been stolen from an apartment complex less than one mile from where he was situated. In order to proceed to the complainant's address, the officer crossed the Philadelphia line, and travelled east on Grant Avenue. While so doing, he observed a yellow Cadillac in the westbound lane of Grant Avenue. Thompson made a U-turn to investigate further. He also observed a Lincoln Continental, operated by appellant, "directly behind the Cadillac"—"the Lincoln seemed to be tailgating the Cadillac . . . making [it] impossible for me to get behind the Cadillac and to get the registration." Thompson pulled alongside the Cadillac when the car was stopped at a traffic light at the corner of Grant and Frankford Avenues. He noticed that the lock cylinder on the left front door had been removed. The officer immediately placed the operator, Thomas Di-Cicco, Jr., under arrest.

Prior to the arrest, Officer Hughes of the Philadelphia Police Department, had observed Thompson's cruiser travelling on Grant Avenue. He followed Thompson when Thompson made the U-turn and arrived next to the Lincoln, also stopped at the light, as Thompson was arresting DiCicco. When Hughes alighted from his cruiser, Thompson told him to cover appellant. Hughes, with his service revolver drawn, told appellant to exit the Lincoln. At that time, Hughes observed a tote bag and a vise grip wrench on the front seat of the Lincoln. Apparently, a "bunch" of General Motors car key blanks were protruding from the tote bag. After the officers handcuffed appellant, they discovered additional car keys, a pair of cutting pliers, a key-making device, a lock punch, and a flashlight. A body search incident to appellant's arrest produced two automobile lock cylinders.

Appellant and DiCicco were held on charges of larceny and possession of burglary tools. Pursuant to an October 7, 1971 preliminary hearing, the Grand Jury approved bills of indictment, number 1924, charging appellant with larceny,[1] and 1924-1, charging appellant with possession of burglary tools.[2] On August 9, 1972, appellant moved to suppress the physical evidence seized on August 19, 1971.[3] After denial of that motion, appellant was tried and found guilty on both bills by the court without jury on November 8, 1972. Post-trial motions were denied on September 12, 1974. On November 1, 1974, appellant was sentenced to serve three to six months in the Bucks County Prison. This appeal followed.

Our Supreme Court has held that "when a police officer stops a vehicle he has 'seized' the vehicle and its

1. The Penal Code, 1939, June 24, P.L. 872, §807, 18 P.S. §4807; superseded by Crimes Code, Act of Dec. 6, 1972, P.L. 1482, §1, 18 Pa. C.S. §101 et seq.

2. The Penal Code, supra; 18 P.S. §4904.

3. Appellant successfully moved to suppress an incriminatory statement during the same proceeding.

occupants and thus, the protections of the Fourth Amendment must be considered." *Commonwealth v. Swanger,* 453 Pa. 107, 111, 307 A.2d 875 (1973). The Court stated that ". . . before the government may single out one automobile to stop, there must be specific facts justifying this intrusion. To hold otherwise would be to give the police absolute, unreviewable discretion and authority to intrude into an individual's life for no cause whatsoever." *Id.* at 112, 307 A.2d at 878. Accord, *Commonwealth v. Murray,* 460 Pa. 53, 331 A.2d 414 (1975); *Commonwealth v. Boyer,* 455 Pa. 283, 314 A.2d 317 (1975); *Commonwealth v. Nastari,* 232 Pa. Superior Ct. 405, 335 A.2d 468 (1975).

*Swanger* suggested that an officer must have probable cause prior to a stop: "We, therefore, hold before a police officer may stop a single vehicle to determine whether or not the vehicle is being operated in compliance with The Vehicle Code, *he must have probable cause* based on specific facts which indicate to him either the vehicle or the driver is in violation of the code." 453 Pa. at 115, 307 A.2d at 879. (Emphasis added.) In *Commonwealth v. Nastari,* supra, this Court extended a "Terry"[4] rationale to automobile stops; that is, in order to determine the identity of a suspicious individual or to maintain the status quo momentarily, a brief stop may be reasonable despite a level of suspicion less than probable cause. Nonetheless, ". . . it is . . . clear that an investigative stop of a moving vehicle to be valid must be *based upon objective facts creating a reasonable suspicion* that the detained motorist is presently involved in criminal activity." *Commonwealth v. Murray,* 460 Pa. at 61, 331 A.2d at 418. (Emphasis added.)

In the instant case, the officers did not stop appellant for tailgating, despite the fact that tailgating is a vio-

---

4. *Terry v. Ohio,* 392 U.S. 1 (1968).

lation of The Vehicle Code.[5] The lower court's opinion and the Commonwealth's brief recite the violation of the Code as a justification for the stop of appellant's vehicle. It is clear, however, that Officer Thompson did not stop appellant for tailgating—he stopped appellant solely because he believed that the driver of the Lincoln was involved in the theft of the Cadillac.[6] Thus, the critical issue is whether tailgating another vehicle which was reasonably believed to be stolen amounts to "objective facts creating a reasonable suspicion" that the driver of

---

5. 1959, April 29, P.L. 58, §1010; 1968, July 15, P.L. 332, No. 162, §5, effective July 1, 1968; 75 P.S. §1010.

6. Officer Hughes's testimony at the preliminary hearing was as follows:

"A. . . . Let me say the Continental was rear bumper of Cadillac and I then assumed the Continental might be involved.

"Q. Did you think this before Thompson yelled to you?

"A. No, after Thompson yelled to me."

Officer Thompson testified as follows:

"Q. Did you ever signal the Continental that you wanted to get in back of the Cadillac?

"A. No, I was only glancing at the Cadillac. I was in the east bound lane I made a U turn and went left lane in back of the Continental. I was in back of the Continental in the left lane . . . .

"Q. You did not actually stop the Continental?

"A. No, *he stopped voluntarily* . . . ." (Emphasis added). If appellant stopped voluntarily, according to Thompson, then clearly Thompson did not stop appellant pursuant to The Vehicle Code, supra.

At the suppression hearing, Thompson testified as follows:

"Q. When you pulled alongside of the Continental, did you in any way signal the driver or operator of the Continental to back off or to do anything?

"A. No, I didn't.

"Q. Is it true that you were concerned mostly with checking the registration of the Cadillac?

"A. Yes.

"Q. So your concentration at this point was not on the Continental, is that correct?

"A. That is correct."

the second automobile was also engaged in criminal activity. I think not. One, tailgating is an extremely common, if inconsiderate and even dangerous, practice of myriad motorists who are otherwise not criminals. Two, the officers in the instant case did not follow appellant long enough to determine whether appellant's action was a strategic effort to obscure the license plate of the Cadillac.[7] Three, at least for part of their observed travel, the two automobiles were approaching a red traffic signal, thereby explaining the proximity of the Lincoln to the Cadillac. Under such circumstances, the possibility of criminal activity was too remote to amount to a "reasonable suspicion" that criminal activity was afoot.

Therefore, I would reverse and remand for a new trial.

---

7.    Thompson testified at the suppression hearing that he followed the Cadillac and the Lincoln for only about 200 yards before he stopped the Cadillac. At that time, neither automobile was being operated in excess of the speed limit of 35 miles per hour.