433 A.2d 79

**COMMONWEALTH of Pennsylvania,**

v.

**Douglas Kent DENNIS, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 14, 1980.

Filed July 31, 1981.

Donald R. Calaiaro, Pittsburgh, for appellant.

Kathryn L. Simpson, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before SPAETH, JOHNSON and POPOVICH, JJ.

POPOVICH, Judge:

Appellant, Douglas Kent Dennis, was arrested and charged with robbery [1] and possession of a prohibited offensive weapon.[2] A timely filed pre-trial motion to suppress evidence was heard and denied. Appellant's first trial ended in a mistrial; thereafter, a second trial was held and a jury found appellant guilty of possessing an offensive weapon and not guilty of robbery. Following denial of post-verdict motions, a sentence of five (5) years probation was imposed. Appellant appeals from said sentence on the basis that the evidence, allegedly obtained as a result of his illegal arrest, was impermissibly admitted into evidence. For the reasons stated herein, we disagree and affirm the judgment of sentence.

The circumstances giving rise to appellant's arrest are as follows: On November 30, 1978, Homestead Police Officers Kelly and Kinney received a radio call at approximately 4:00 A.M. to check out "a suspicious car in the 100 block, East Plum Way"—this section of the Borough was considered by police to be a "high-crime" area which "had quite a few assaults and strongarms." (N.T. 5/16/79, at 57) When the officers arrived at the site they observed a vehicle blocking access to and from the alley, an individual, later identified as Russell Brooks, leaning into the right front passenger side door and three individuals sitting in the vehicle, i. e., James Teter (the complainant), a Joseph Ellis and the appellant. The police drove within 15 feet of the vehicle and started walking toward it when Brooks alighted completely out of the vehicle and began shouting, "nothing is happening, noth-

1. 18 Pa.C.S.A. § 3701.

2. 18 Pa.C.S.A. § 908. A co-defendant, Russell Brooks, was acquitted of the only offense with which he was charged, i. e., robbery.

ing is going on." *Id.* at 55. Officer Kelly told him to "Hold it". Brooks became somewhat nervous, e. g., he started "jumping up and down" and "walking back and forth" saying, " 'There's nothing happening here. We just lost something. Everything is all right. You can leave.' " (N.T. 6/13/79, at 113) When Brooks failed to heed a second request to "Hold it", the officers drew their weapons and aimed them in the air; the officers then ordered the occupants out of the vehicle. James Teter ran from the vehicle into the police cruiser yelling, "They have got a gun." (N.T. 6/13/79, at 38) Hearing this, Officer Kelly radioed for assistance and within a short period of time two additional squad cars arrived. The police made arrests and conducted pat-downs. A .20 gauge No. 6 Remington shotgun shell and a piece of string was seized from appellant's person.[3] A search of the vehicle produced a .20 gauge sawed-off shotgun located in the right rear section, the exact spot where appellant sat.[4]

The appellant contends on appeal that his arrest was unlawful.[5] Thus, given the illegality of the arrest, appellant asserts that the evidence seized as a result thereof was

---

**3.** James Teter told police the piece of string was attached to a sawed-off shotgun pointed at his head and it in turn was wrapped around the appellant's neck. (N.T. 5/16/79, at 24) He also stated that he had picked up the appellant and the others hitchhiking in the Oakland section of Pittsburgh and had agreed to drive them to Homestead. While en route, he was forced to drive into an alley (East Plum Way) where the appellant held a sawed-off shotgun to his head and demanded money. The incident was interrupted by the arrival of the police.

**4.** The police also found James Teter's wallet and credit cards scattered around the front seat of the vehicle.

**5.** More particularly, appellant asserts that "when Officers Kelly and Kinney pulled their police car in front of the car that he was in, and when the officers approached the car with their guns drawn, this constituted an arrest." (Appellant's Brief, at 8) The Court concludes that the actions of the police were consistent with the effectuation of an "investigatory stop." As a result, the standard by which the officers' actions are to be judged is whether they "observed unusual and suspicious conduct by such person which may reasonably lead [them] to believe that criminal activity is afoot." (Citations omitted) *Commonwealth v. Galaydna*, 248 Pa.Super. 226, 230, 375

tainted and inadmissible at trial, rendering his conviction unwarranted. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We do not agree.

■ Before discussing the validity of appellant's arrest we will first address the propriety of the "investigatory stop," which appellant assails on the basis that, *inter alia*, the prosecution failed to prove: "A. That [the police] observed unusual conduct which led [them] to reasonably conclude in light of [their] experience that criminal activity was afoot *and* that the person with whom [they were] dealing with may [have] be[en] armed and presently dangerous." [6] (Emphasis in original) (Appellant's Brief, at 11)

A.2d 69, 71 (1977). This matter is discussed more fully *infra*. It is to be noted that on this exact subject:

"The better view . . . is that an otherwise valid stop is not inevitably rendered unreasonable merely because the suspect's car was boxed in by police cars in order to prevent it from [being] moved. Likewise, it cannot be said that whenever police draw weapons the resulting seizure must be deemed an arrest rather than a stop and thus may be upheld only if full probable cause was then present. The courts have rather consistently upheld such police conduct when the circumstances (e. g., suspicion that the occupants of a car are the persons who just committed an armed robbery) indicated that it was a reasonable precaution for the protection and safety of the investigating officers." (Footnotes omitted) (Citing cases) 3 Wayne F. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment.* § 9.2, at 30; *see also Commonwealth v. Greber*, 478 Pa. 63, 385 A.2d 1313 (1978).

In *Commonwealth v. Ferraro*, 237 Pa.Super. 268, 352 A.2d 548 (1975), this Court made mention, in upholding the propriety of an "investigatory stop" and evidence seized as an incident thereto, that:

"Moreover, we do not believe that simply because Officer Hughes withdrew his service revolver while directing appellant to alight from the Lincoln turned this investigatory stop into an arrest. As the Fifth Circuit Court of Appeals has observed: 'It does not seem to us that, without regard to motive, solely because an officer draws his weapon, an investigatory stop is turned into an arrest. To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).' *United States v. Maslanka*, 501 F.2d 208, 213 at n. 10 (5th Cir. 1974). Instantly, in view of the late hour of the night and the serious nature of the crime under investigation (stolen vehicle), we think the officer was justified in taking appropriate measures to protect himself." *Id.*, 237 Pa.Super. at 275, 352 A.2d at 551.

6. The appellant also avers that the police failed to prove:

Appellant's assertion is meritless. "Such a contention is undoubtedly true in a situation where the police stop a person *and* frisk him, because the frisk itself is a search within the context of the Fourth Amendment. *See Terry v. Ohio,* [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]. However, *in a situation such as the one presented in the case at bar, there is no necessity that the police suspect that the person is armed and dangerous before a valid investigatory stop limited solely to questioning can be performed."* (Emphasis added) (Citations omitted) *Commonwealth v. Galadyna,* 248 Pa.Super. 226, 232, 375 A.2d 69, 72 (1977). All that need be shown is "a reasonable suspicion that criminal activity is afoot." *Id.* Here, such "reasonable suspicion" existed as a result of: 1) the unsolicited statements from Brooks advising the police that "nothing is happening here, you can go"; 2) Brooks' *erratic* behavior ("jumping up and

"B. That in the course of investigation . . . [they] identified [themselves] and made reasonable inquiries; and
C. That nothing in the initial stages of the encounter served to dispel [their] reasonable fear for [their] own or others' safety. *Terry v. Ohio,* supra, at 30–31 [88 S.Ct. at 1884–1885] (1968)." (Appellant's Brief, at 11)
Regarding Point B, a review of the record reveals that the officers responded to the call in a marked vehicle and in uniform. Consequently, their "identity" was obvious on sight. Further, because of the manner in which the sequence of events unfolded, the police had little chance to make any "reasonable inquiries" before acting. As for Point C, it is no less persuasive since such "safety" factor normally arises in the context of a "stop *and* frisk." Here, the police observed enough facts to justify a "stop." *See, e. g., Commonwealth v. Galadyna, supra; Commonwealth v. Everett,* 234 Pa.Super. 249, 338 A.2d 662 (1975); *Commonwealth v. Massie,* 221 Pa.Super. 453, 292 A.2d 508 (1972); *Commonwealth v. Howell,* 213 Pa.Super. 33, 245 A.2d 680 (1968); *cf. Commonwealth v. Pegram,* 450 Pa. 590, 301 A.2d 695 (1973) ("stop" may be justified by police observing "unusual conduct;" however, absent the observation of facts evidencing that appellant was "armed and dangerous," the "frisk" was not warranted); *Commonwealth v. 1958 Plymouth Sedan,* 418 Pa. 457, 211 A.2d 536 (1965) (suspicious looking car in area of probable crime, no probable cause). *See* discussion *infra.* Moreover, the "investigatory stop" was converted *into a probable cause to arrest* situation when James Teter informed police that the three men were in possession of a gun. Therefore, the police never did have a chance to "frisk" appellant; rather, when the police did act it was pursuant to a "search and seizure" conducted incident to appellant's arrest.

down, moving back and forth"); 3) the fact that the vehicle was parked in the middle of the alley; 4) the "high-crime" area in which this encounter took place; 5) the lateness of the hour—4:00 A.M.; and 6) the absence of any movement or statement from anyone sitting in the vehicle during the exchange between Brooks and the police. Viewing anyone of the preceding facts in isolation, it cannot be gainsaid that there would be a lack of a reasonable suspicion to believe that criminal activity was afoot, *see Commonwealth v. Pollard*, 450 Pa. 138, 299 A.2d 233 (1973); *Commonwealth v. Williams*, 287 Pa.Super. 19, 429 A.2d 698, (1981); *Commonwealth v. Hunt*, 280 Pa.Super. 205, 421 A.2d 684 (1980); *Commonwealth v. Purnell*, 241 Pa.Super. 230, 360 A.2d 737 (1976); *Commonwealth v. Cruse*, 236 Pa.Super. 85, 344 A.2d 532 (1975); however, taken *in concert* they legitimize the action of the police. *See e. g., United States v. Cortez*, 449 U.S. 621, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Commonwealth v. Lybrand*, 272 Pa.Super. 475, 481, 416 A.2d 555, 558 (1980); *Commonwealth v. Stratton*, 231 Pa.Super. 91, 94, 331 A.2d 741, 742 (1974); *Commonwealth v. Galadyna, supra; see generally Commonwealth v. Gillis*, 217 Pa.Super. 159, 163, 269 A.2d 135, 137 (1970) (Hoffman, J., concurring opinion); *Commonwealth v. Meadows*, 222 Pa.Super. 202, 206, 293 A.2d 365, 367 (1972); *Commonwealth v. Massie*, 221 Pa.Super. 453, 456, 292 A.2d 508, 510 (1972); *Commonwealth v. Howell*, 213 Pa.Super. 33, 40–41, 245 A.2d 680, 683–84 (1968).

We consider the actions of the police here consistent with the dictates of the Fourth Amendment, since "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary *Terry*[, *supra*] recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be reasonable in light of facts known to

the officer at the time." (Citations omitted) *Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Commonwealth v. LeSeuer*, 252 Pa.Super. 498, 382 A.2d 127 (1977).

Given the fact that " '[s]treet encounters between citizens and police officers are incredibly rich in diversity,' " *Commonwealth v. Wascom*, 236 Pa.Super. 157, 160, 344 A.2d 630, 632 (1975), one begins to understand why the judiciary has been unable to draw a bright line between police conduct which will be condoned and that which will be deprecated. Nonetheless, there has evolved in this Commonwealth a very strong public policy in favor of permitting police to respond to reports of crime, to investigate, and, hopefully, *prevent any injury. Commonwealth v. Daniels*, 280 Pa.Super. 278, 421 A.2d 721 (1980). The fact that in the instant case the anonymous call to the police station did not report the *commission* of *any* crime is no reason not to apply the same public policy considerations in upholding the actions of the police. *Cf. Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2631, 61 L.Ed.2d 357 (1979) (in considering the constitutionality of officers detaining an accused for the purpose of requiring him to identify himself, a court must weigh the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty).

■ We conclude therefore that, based on all the facts and reasonable inferences to be derived therefrom, when the police directed Brooks to "hold it", it was a proper course of action taken to maintain the status quo momentarily so that the identification and purpose of those present could be ascertained and verified.[7] *See Commonwealth v. Lybrand,*

7. The police would have been justified in detaining for brief investigatory purposes those present on the scene for a possible violation of the Motor Vehicle Code—illegal parking (75 Pa.C.S.A. §§ 3352 & 3353) *See generally Cortez v. United States, supra; Commonwealth v. Orwig*, 248 Pa.Super. 284, 375 A.2d 99 (1977); *Commonwealth v. Kloch*, 230 Pa.Super. 563, 327 A.2d 375 (1974); *Commonwealth v. Smith*, 225 Pa.Super. 509, 311 A.2d 716 (1973).

*supra; Commonwealth v. Galadyna, supra; Commonwealth v. King,* 247 Pa.Super. 443, 447, 372 A.2d 908, 910 (1977) ("The investigatory stop is a useful and necessary police tool. It fills the gap between circumstances where the officer obviously has no right to invade personal privacy. It credits police officers with an instinct developed through years of experience and observation."); *see also Commonwealth v. Mackie,* 456 Pa. 372, 320 A.2d 842 (1974); *Commonwealth v. Hicks,* 434 Pa. 153, 158, 160, 253 A.2d 276, 279 (1969); *Commonwealth v. Murray,* 226 Pa.Super. 101, 313 A.2d 293 (1973). However, before this "intermediate response" could be implemented, James Teter informed the police that the three individuals he was with had a gun. At this point, "the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that [a] citizen had committed or was committing an offense." *Commonwealth v. Mackie, supra,* 456 Pa. at 375, 320 A.2d at 843; *see also Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Commonwealth v. Bosurgi,* 411 Pa. 56, 67, 190 A.2d 304, 310 (1963) (" 'In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."). Therefore, the police were justified in arresting the appellant and searching his person and the vehicle for weapons. *Commonwealth v. Bosurgi, supra; see generally Commonwealth v. Seip,* 285 Pa.Super. 551, 428 A.2d 183 (1981).

Accordingly, we hold that the evidence seized was done so incident to a lawful arrest, which started out as an "investigatory stop" based upon definite, articulable facts that gave the police sufficient cause to act. Thus, the evidence was properly introduced at trial, *Wong Sun v. United States, supra,* and the jury's verdict will not be disturbed.

Judgment of sentence affirmed.