622 A.2d 293

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Eric WILSON, Appellee.**

Superior Court of Pennsylvania.

Argued Dec. 9, 1992.

Filed Feb. 3, 1993.

Reargument Denied April 14, 1993.

Joseph J. Mittleman, Asst. Dist. Atty., Media, for Com., appellant.

Vincent G. Iannello, Media, for appellee.

Before CAVANAUGH, BECK and POPOVICH, JJ.

POPOVICH, Judge:

The Commonwealth appeals the order of the Court of Common Pleas of Delaware County suppressing evidence

seized from the defendant/appellee, Eric Wilson.[1] We affirm.

Where, as here, "the Commonwealth is appealing the adverse decision of a suppression court, a reviewing court must consider only the evidence of the defendant's witnesses and so much of the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted." *Commonwealth v. Hamlin,* 503 Pa. 210, 216, 469 A.2d 137, 139 (1983).

Application of the *Hamlin* standard in the instant case, given that the defendant produced no witnesses on his behalf, reveals that in June of 1991, Detective John Easton, of the Delaware County District Attorney's Office, received the following information from a confidential informant concerning the defendant; to-wit:

> That Qawi [—a nickname for the defendant—] is normally in the 600 block of Edwards Street in the Lamokin Village Project area. He deals in the sales of cocaine. * * * And that he drives a maroon Dodge Caravan. When he's usually in the Caravan, there's a 9 millimeter automatic—a multi-shot automatic ... loaded under the seat. And he usually has a large amount of cocaine. He went on to state that if Qawi is outside the van, he's got a multi-shot 9 millimeter automatic tucked in his waistband and he has cocaine on his person.

Two or three days *after* the receipt of this information, i.e., June 17, 1991, Detective Easton and his partner, Detective William Welsh, Jr., were assigned to investigate a murder in the 600 block of Edwards Street.

At approximately 11:10 a.m. on the day in question, Detective Easton was in the process of radioing information from his vehicle when he looked in his rear view mirror and saw the defendant "leave ... one of the houses on the odd side of the 600 block of Edwards Street." The defendant entered a red Dodge Caravan and drove south. The detective then wit-

---

1. The Commonwealth certifies, as it is required to do, that the order in question, if given effect, will substantially handicap or terminate the prosecution of the appellee. See *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985).

nessed the defendant execute a left turn and drive in a westerly direction out of the Lamokin Village Project area.

Next, Detective Easton yelled to his partner: "I see Qawi," or words to that effect, or "Let's go. Let's go." The two pursued the defendant and observed him make two turns before ending up on Third Street. At this point, at Third and Tilghman, the defendant's vehicle was stopped by the detectives. Before doing so, however, Detective Easton had activated audible and visual signals on his vehicle to no avail.

Prior to approaching the defendant's vehicle, Detective Easton observed, through the back window of the defendant's vehicle, that the defendant's "right shoulder was dipping down . . . several times [and] . . . [he] made several motions towards the . . . floor of the vehicle."

Once the defendant's vehicle was stopped, the two detectives, with weapons drawn, advanced toward the van. As Detective Welsh approached from the passenger's side, he looked into the vehicle and saw the "butt of a semi-automatic weapon" protruding from the seat on the driver's side, underneath the defendant's leg. This was communicated to Detective Easton, who was on the driver's side of the Dodge Caravan.

Detective Welsh directed the defendant to open the passenger door. Upon doing so, Detective Welsh retrieved a gun, next to which was a plastic bag containing 44 smaller plastic bags which field tested positive for cocaine. Also removed from the vehicle were 150 rounds of 9 millimeter ammunition, a bag containing marijuana and 3–4 marijuana joints. Thereafter, the defendant was charged with drug and firearm violations.

A hearing was held on the defendant's motion to suppress the evidence seized. The court, after taking testimony, entered an opinion and order granting the motion. This appeal by the Commonwealth followed.

It is the Commonwealth's contention that the police engaged in an "investigatory stop" of the defendant's vehicle armed with specific and articulable facts from which they could

reasonably conclude that criminal activity may have been afoot. More particularly, the Commonwealth argues that:

Police had received information that Wilson was a cocaine dealer in the 600 block of Edwards Street in the Lamokin Housing Project, that he drove a maroon Dodge Caravan, that he usually had a large amount of cocaine in the Caravan and kept a .9 millimeter pistol under the driver's seat. The information had been received by the police two or three days before the stop from an informant who had given information on at least two occasions which had proven reliable and led to arrests. When the police saw Wilson in the 600 block of Edwards Street driving the maroon Caravan, *they possessed specific and articulable facts which led them to reasonably believe that criminal activity was afoot.* They were therefore justified in stopping Wilson's vehicle.

Commonwealth's Brief at 6 (Emphasis added).

 It is beyond cavil that, in this Commonwealth, the police must meet the requirements of the Fourth Amendment of the United States Constitution when conducting an investigatory stop of an automobile. *Commonwealth v. Nastari,* 232 Pa.Super. 405, 408, 335 A.2d 468, 470 (1975). Moreover, when the police stop a vehicle it and its occupant(s) are considered "seized", and, thus, the protections of the Fourth Amendment apply. *Commonwealth v. Swanger,* 453 Pa. 107, 307 A.2d 875 (1973).

The crucial question, therefore, is whether the stop or seizure of the defendant's vehicle was unreasonable and, as a result, constitutionally impermissible. In assessing the reasonableness of a seizure, the United States Supreme Court has articulated some guidelines; namely:

"The officer [making a *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) stop] ... must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."' [*Terry,* 392 U.S.,] at 27 [88 S.Ct. at 1883]. The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. *INS v. Delgado,* 466 U.S. 210, 217 [104 S.Ct.

1758, 1763, 80 L.Ed.2d 247] (1984). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' [*Illinois v. Gates*, 462 U.S., 213 at 238, 103 S.Ct. 2317 at 2332, 76 L.Ed.2d 527 (1983) ], and the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause."

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams* [407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ], *supra*, demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. 407 U.S., at 147, 92 S.Ct., at 1923–24. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The *Gates* Court applied its totality of the circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of its indicia of reliability as established through independent police work. The same approach applies in the reasonable

suspicion context, the only difference being the level of suspicion that must be established.

*Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990).

"Thus, it is also clear that an investigative stop of a moving vehicle to be valid must be based upon objective facts creating a reasonable suspicion that the detained motorist is *presently* involved in criminal activity." *Commonwealth v. Murray,* 460 Pa. 53, 61, 331 A.2d 414, 418 (1975) (Emphasis added); *Commonwealth v. Lagamba,* 418 Pa.Super. 1, 11 n. 7, 613 A.2d 1, 5–6 n. 7 (1992).

Instantly, the only evidence tending to implicate the defendant's vehicle in the commission of a crime was the statement made by the confidential informant that: "When [the defendant is] usually in the caravan, there's a 9 millimeter automatic . . . loaded under the seat. And he *usually* has a large amount of cocaine." (Emphasis added) However, in none of the statements attributed to the confidential informant is there any indication that he/she saw the defendant in possession of or transact a sale of drugs, nor did the confidential informant give any reason to believe that drugs were present in the van *at the time the information was provided to the police,* let alone 2–3 days thereafter. Cf. *Commonwealth v. Davis,* 407 Pa.Super. 415, 417, 595 A.2d 1216, 1218 (1991) (Probable cause context); *Commonwealth v. Flaherty,* 400 Pa.Super. 397, 398, 583 A.2d 1175, 1176 (1990) (semble).

Thus, we have no insight as to the "basis" of the confidential informant's "knowledge" with regard to the information recited to the police. See *Alabama v. White,* supra, 496 U.S. at 327, 110 S.Ct. at 2415 (Veracity, reliability and *basis of knowledge* are relevant in the "reasonable suspicion" context). This does not mean that this aspect of the "reasonable suspicion" criteria cannot be satisfied by the detailed nature of the tip. *Id.* However, we find that the color and type of vehicle driven by the defendant were facts not restricted to those in the defendant's inner circle of friends. It would have been information accessible to the public and *general* acquaintances of the accused.

Moreover, the most glaring element, conspicuous by its absence, is the failure of the confidential informant to provide the police with any "time-frame" within which these activities allegedly were committed by the defendant.[2]

Reference by the police to the confidential informant advising them of the "normal" location (600 block of Lamokin Village Project) of the defendant and his "usual" possession of cocaine while in or near his maroon colored van, lose their semblance of reliability [3] when coupled with the police's failure to act on the information over a period of 2–3 days. This inaction only dissipates the "reasonable suspicion" required to condone an "investigatory stop" of the defendant's vehicle.

In those cases reviewed by this Court, where investigatory stops have been validated, the police have acted on the information received from a confidential informant or anonymous tipster almost immediately after the receipt of the information leading one justifiably and reasonably to suspect that criminal activity was afoot. See, e.g., *Alabama v. White*, supra (Anonymous tip received at 3:00 p.m., which exhibited sufficient indicia of reliability to provide reasonable suspicion to make investigatory stop, acted upon at 4:18 p.m.); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (Unverified tip by known informant supported *Terry* stop and frisk shortly after its receipt); *Commonwealth v. Baker*, 518 Pa. 145, 541 A.2d 1381 (1988) (Police stopped vehicle thirty minutes after tip of a crime and searched vehicle without a warrant); *Commonwealth v. Ogborne*, 410 Pa.Super. 164, 599 A.2d 656 (1991) (Confidential informant's information acted upon by police within the same day received to conduct valid stop and frisk); *Commonwealth v. Ferraro*, 237 Pa.Super. 268, 352 A.2d 548 (1975) (Minutes elapsed between report of stolen

**2.** Parenthetically, we would observe that the absence of a time-frame for the alleged criminal activity undermines the "stop and frisk" prong of the police's arsenal of weapons to curb crime, and it also renders suspect the police's ability to secure a search warrant had one been sought by the officers. See *Commonwealth v. Flaherty*, 400 Pa.Super. 397, 583 A.2d 1175 (1990).

**3.** The element of veracity, on the other hand, was satisfied by the fact that within the last year the confidential informant had supplied the police with sufficient information leading to two arrests.

vehicle and probable cause to pursue, stop and apprehend guilty party).

At bar, the police were not given a time-frame for the alleged criminal activity assigned to the defendant by the confidential informant. Rather, they believed that, almost by happenstance, the defendant would be spotted by the police during their excursions in the 600 block of the Lamokin Village Project. And, *at that point in time*—no one knows when this would transpire: a day, a week, or a month after receipt of the information—the police would act to "stop and frisk" or "arrest" the defendant.[4]

■ In any event, we find that the lack of a time-table for the improprieties attributed to the defendant is fatal to the Commonwealth's case. Cf. *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991) (Probable cause context); *Flaherty*, supra (semble); *Commonwealth v. Kalinowski*, 303 Pa.Super. 354, 449 A.2d 725 (1982). Further, the defendant's entry into a maroon van and driving off in broad daylight can not be equated with the observance of specific instances of unusual and suspicious conduct on the part of the police to lead them reasonably to believe that criminal activity was afoot.[5] See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Murray*, supra; *Commonwealth v. Galadyna*, 248 Pa.Super. 226, 228, 375 A.2d 69, 71 (1977); *Ferraro*, supra; *Commonwealth v. Howell*, 213 Pa.Super. 33, 245 A.2d 680 (1968).

Therefore, to condone the actions of the police would allow them a field-day by holding information indefinitely, without consideration to staleness or the scrutiny of a detached judicial officer,[6] before executing upon it. We can not sanction

---

4. We are not privy to the manner in which the authorities would act to restrain the defendant.

5. Also, during the police's pursuit of the defendant's vehicle, no motor vehicle code violations were committed.

6. As an aside, we would note that there was no evidence of "exigent circumstances" precluding the police from attempting to secure a warrant for the defendant.

this type of dilatory action by the police under the guise of curbing crime in our streets.

Finding that the action of the suppression court to be proper, we will affirm the order appealed.

Order affirmed.

BECK, J., files a concurring statement.

CAVANAUGH, J., files a dissenting statement.

BECK, Judge, concurring:

I join the majority and add the following. I believe that the officers, in the absence of exigent circumstances, should have attempted to secure a warrant after their receipt of the information. Whether they would have been successful, without further corroboration, is another question. *See Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991). Further, I do not believe, as argued by the Commonwealth, that the stop here can be viewed as an investigative stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). I sympathize with a police officer's difficulty, as was testified to at the suppression hearing, in daily receiving a variety of tips about many different persons within his area of patrol. However, the purpose underlying *Terry* stops is to assist police officers in taking necessary, swift action after an on-the-spot observation (or, at least, a recent tip) of suspicious behavior, not to provide an alternate method of search and seizure where police are too busy to conduct surveillance and secure a warrant. If the officers had acted promptly to corroborate the tip and, further, to investigate appellee, a *Terry* stop may have been proper under the rationale of *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) and *Commonwealth v. Ogborne,* 410 Pa.Super. 164, 599 A.2d 656 (1991).

CAVANAUGH, Judge, dissenting:

I respectfully dissent.

Although the information available to the police was not related in terms of refined legal terminology, it is more than

120

sufficient to meet the standard that, in fact, caused the arresting officers to act in this case (i.e., that there was reasonable suspicion that contraband would be found). I would reverse the suppression order.