624 A.2d 1068

**In the INTEREST OF S.J.**

**Appeal of S.J.**

Superior Court of Pennsylvania.

Argued Feb. 18, 1993.

Filed May 11, 1993.

Stuart Lev, Asst. Public Defender, Philadelphia, for appellant.

Mary Porto, Asst. Dist. Atty., Philadelphia, for Com.

Before BECK, POPOVICH and BROSKY, JJ.

POPOVICH, Judge:

An appeal has been perfected from the adjudication of delinquency and commitment entered by the Court of Common Pleas of Philadelphia County, Juvenile Branch, by the Defendant/Appellant, S.J. We reverse.

■ The sole issue raised for our consideration is whether the court below erred in denying the Defendant's motion to suppress. In reviewing the rulings of a suppression court, our standard of review is well-defined and narrow. We are limit-

ed to determining whether the factual findings of the lower court are supported by the record and whether the legal conclusions drawn from those facts are in error. *Commonwealth v. Rodgers*, 413 Pa.Super. 498, 605 A.2d 1228, 1237 (1992).

> In making this determination, we consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense, as, fairly read in the context of the record as a whole, remains uncontradicted. If, when so viewed, the evidence supports the factual findings, we are bound by such findings and may only reverse if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Chiesa*, 329 Pa.Super. 401, 478 A.2d 850, 851 (1984).

In the instant case, the record discloses that Philadelphia Police Officer Jecal Dulany was on "tour duty" on March 10, 1992. He received a radio call at approximately 2:35–:40 p.m. The radio call came in on "911", but the officer did not know when the call was received or who phoned the authorities. N.T. 5/1/92 at 10. It was reported that a black female, wearing a red jacket, blue jeans, red sneakers and curlers in her hair was selling narcotics on the 2300 block of West Turner. Additionally, it was communicated that the female was keeping the narcotics inside her jacket.

Within ten minutes of the radio call, Officer Dulany arrived in the area and, upon turning onto 24th Street, observed the Defendant for five to fifteen seconds before pulling along side her at 23 West Turner. She matched the description relayed over the radio and was in the company of two males standing within a couple feet of each other. The Appellant, upon seeing the cruiser, "just stared" at the police.

Officer Dulany exited his vehicle and walked toward the Appellant. He told the two males to disperse. The officer placed the Appellant's hands against the trunk of his vehicle, her legs were spread and the officer had placed his hand "on her back" until policewoman Barnette arrived on the scene to conduct a "patdown".

Officer Barnette was Officer Dulany's backup. She had heard the same radio broadcast, knew what the "job" entailed and that narcotics were reported to be inside the Appellant's jacket. N.T. 5/1/92 at 16.

Officer Barnette patted-down the Appellant, which included "reach[ing] into the ... inside jacket pocket" of the Appellant and pulling out a plastic bag containing seventy-one clear plastic vials with red tops and fifty-five dollars in U.S. currency. Thereafter, the Appellant was arrested. N.T. 5/1/92 at 6 & 16.

After hearing testimony and argument on the search and seizure, the court denied the Appellant's motion to suppress and imposed a sentence of probation. The present appeal followed and assigns error to the court in failing to suppress evidence claimed by the Appellant to have been secured on the basis of an anonymous radio call, *uncorroborated* by the police prior to seizing the evidence in question, i.e., cocaine.

Initially, we need to decide whether the conduct of the police constituted a "stop and frisk" (requiring only a reasonable suspicion that criminal activity was afoot) or an arrest (necessitating probable cause to believe that a crime is being or was committed and that the Defendant is the perpetrator). See *Commonwealth v. Campbell*, 418 Pa.Super. 391, 614 A.2d 692, 696 (1992); *Commonwealth v. Dennis*, 417 Pa.Super. 425, 612 A.2d 1014, 1015–16 (1992). The information necessary to legitimize a "stop and frisk" versus an "arrest" being different in quantum and quality, id.; *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), we find that the facts before the police did not rise to the level of probable cause ("a fair probability that contraband or evidence of a crime will be found," *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)), and, thus, we are left with a determination of whether the level of suspicion required for a *Terry*[1] stop was present:

> "The officer [making a *Terry* stop] ... must be able to articulate something more than an 'inchoate and unparticu-

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

larized suspicion or "hunch." ' [*Terry,* 392 U.S.,] at 27 [88 S.Ct. at 1883]. The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. *INS v. Delgado,* 466 U.S. 210, 217 [104 S.Ct. 1758, 1763, 80 L.Ed.2d 247] (1984). That level of suspicion is considerably less than proof of a wrongdoing by a preponderance of the evidence. We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' [*Gates,* 462 U.S., at 238, 103 S.Ct. at 2332], and the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause."

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams,* [407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ] *supra,* demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. 407 U.S., at 147, 92 S.Ct., at 1923–24. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. The *Gates* Court applied its totality of the circumstances approach in this manner, taking into account the facts known to the officers from personal observation, and giving the anonymous tip the weight it deserved in light of

its indicia of reliability as established through independent police work. The same approach applies in the reasonable suspicion context, the only difference being the level of suspicion that must be established.

*Commonwealth v. Wilson,* 424 Pa.Super. 110, —— – ——, 622 A.2d 293, 295–96 (1993) (Citation omitted).

■ At bar, there can be no question that Officer Dulany "seized" S.J. when he directed her to stand, with her legs spread, facing the police cruiser and her arms outstretched with palms against the trunk of the vehicle and his one hand placed upon the lower portion of her back, see *Terry v. Ohio,* 392 U.S. 1, 16–17, 88 S.Ct. 1868, 1877–78, 20 L.Ed.2d 889 (1968), and Officer Barnette subjected her to a "search" when she patted-down S.J. and placed her hand inside S.J.'s jacket. Id.

We need to decide whether at the point the officers acted as they did it was reasonable for the police to have interfered with S.J.'s personal security. In making this determination, *Terry* teaches us that:

> ... in justifying the particular intrusion the police officer must be able to point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

\* \* \* \* \* \*

If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people

would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police."

392 U.S. at 21–22, 88 S.Ct. at 1880 (Emphasis added; citations omitted; footnotes omitted).

Applying the *Terry* principles to this case, it must be recognized that effective crime prevention and detection allow for the police, in an appropriate manner and circumstances, to approach a person for purposes of investigating possible criminal behavior.

■ Officer Dulany testified that when he arrived on the scene, S.J. "looked in [his] general direction". However, S.J. did not run, walk away, drop anything to the ground, accept any item(s) from either of the two black males in her company, nor did she give anything to these individuals. N.T. 13. Thus, we have the observance of no "unusual conduct" by Officer Dulany which, when coupled with the innocuous behavior of S.J.'s mere presence at the stated location matching a "911" caller's description of one selling and possessing drugs, would lead a reasonable person to conclude that criminal activity was afoot.

Further, absent articulable facts, Officer Dulany's partner was likewise precluded from completing the second-leg of the *Terry* investigative procedure, i.e., the "frisk". As stated by *Terry,* supra, on this subject; to-wit:

... where a police officer *observes unusual conduct* which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquires, and *where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.* Such a search is a reasonable search under the Fourth Amend-

ment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken. 392 U.S. at 30–31, 88 S.Ct. at 1884–85 (Emphasis added).

■ There is no disputing the fact that, given the information received, the police, as part of good investigative procedures, were "allowed to 'stop' [S.J.] and detain [her] briefly for questioning upon suspicion that [s]he may be connected with criminal activity." *Terry*, supra, 392 U.S. at 10, 88 S.Ct. at 1874. In fact, Officer Dulany did just that when he arrived on the scene: "[I] stopped her for investigation. I had her put her hands on the patrol car. I was asking her name, her date of birth [when Officer Barnette came on site, searched her person and found cocaine]." N.T. 14.

However, when Officer Dulany failed to observe any conduct corroborating the radio dispatch of criminal activity attributed to S.J., and when his questioning of S.J. did not disclose evidence (e.g., furtive activity, evasive conduct and/or erroneous information to his questions) indicative of criminal activity, the police had no reason to detain S.J. any longer nor search the inside of her jacket.[2]

2. *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968), provides that:

> ... an officer [who] is justified in believing that the individual whose *suspicious* behavior he is investigating at close range is armed and presently dangerous to the officer or to others, [this entitles the officer] ... to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. [Emphasis added]

Officer Dulany testified that he never "patted-down" S.J. before Officer Barnette arrived and "reache[d] into the ... inside jacket pocket" of S.J. and removed a plastic bag containing vials of cocaine. N.T. 16. We have no idea what Officer Barnette felt during her pat-down of the Appellant, which caused her to reach into the Appellant's jacket, since Officer Barnette did not appear at the suppression hearing to give her version of the events in question.

Although drug investigations are incredibly rich in diversity and are prone to violence, Officer Dulany received no information over the radio that S.J. had a weapon, nor was he "threaten[ed]" in any way by S.J. N.T. 14–15. Further, Officer Dulaney did not cite any conduct assignable to the Appellant which would prompt him reasonably to believe that his safety or that of his partner or the public was at risk.

For example, the Appellant had been directed to face the police cruiser, spread her legs and place her hands on the trunk of the vehicle.

The absence of any "specific facts" being articulated by the officers to establish their "reasonable suspicion" that criminal activity was afoot or that the Appellant was armed and dangerous render the search illegal. Contrast *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); *Terry*, supra.

The trial court relies upon *Commonwealth v. Lagana*, 517 Pa. 371, 537 A.2d 1351 (1988), to justify the denial of the Appellant's motion to suppression.

In *Lagana*, our Supreme Court was confronted with a "stop and frisk" prompted by a police radio call containing information from an unidentified source that there was a white male, twenty to twenty-five years of age, wearing a yellow raincoat in possession of a gun on a specific corner in Philadelphia.

Within a couple of minutes of the call, the police arrived at the location and observed a man fitting the description looking through binoculars at a business establishment approximately thirty feet away. The officer exited his vehicle, approached the Defendant, immediately frisked him and found a revolver in the waistband of his slacks. The Defendant was arrested for illegal possession of a firearm.

Also, the officer observed at the feet of the Defendant a black camera case, a brown case and a small purple pouch. These items were seized, searched at the police station without a warrant and proved to contain stolen items resulting in burglary charges being filed against the Defendant. A motion to suppress was granted and affirmed by Superior Court, which held that the police did not have a reasonable suspicion justifying a *Terry*-stop. On appeal, the Supreme Court reversed holding that the police had reason to believe that the Defendant was armed and dangerous because he was suspected of possessing a weapon and the police observed conduct (a

Her two male companions had been directed to leave the area and there were no other pedestrians at the site at the time of the "stop". As such, the facts did not, objectively viewed, reveal a situation either establishing the presence of criminal activity or the need to "pat-down" the Appellant as a protective measure for the safety of the officers or others in the vicinity. Therefore, the search was violative of *Terry*, supra.

man fitting the description "casing" a business establishment with a pair of binoculars) suggesting that the Defendant was engaged in criminal activity. Specifically, our Supreme Court ruled that:

> This *suspicious* conduct under the circumstances, taken as a whole, suggested that [the Defendant] was involved in criminal activity and was the person with the gun who the officer was seeking.

Id. at 377, 537 A.2d at 1354 (Emphasis added).

In the present case the information (as to location and description) broadcast over the police radio was verified. However, unlike in *Lagana* (where description and location were juxtaposed with observing the Defendant "casing" a business with binoculars), *sub judice* the police were unable to point to specific and articulable facts which, taken together with rational inferences to be drawn therefrom, reasonably warranted the intrusion.

Indeed, the Appellant was talking with two others on a street. This is completely consistent with innocent behavior. And, when the police arrived on the scene, she merely "stared" at the authorities. Further, the two black males in her company stayed on the scene and, in fact, had to be directed to leave. Lastly, and most importantly, there were no furtive attempts at concealment, no fleeing of the scene and no other activity which would remove the Appellant's behavior from that of an ordinary citizen to that of a suspected criminal warranting a *Terry* "frisk".

Based on information received and corroborated as to location and description, the police were permitted to "stop" (for investigative purposes) the Appellant briefly for questioning to dispel or confirm her connection with criminal activity. *Terry*, supra. Officer Dulany had embarked on such an investigative course—questioning the Appellant. His inquiry was curtailed, however, by Officer Barnette's pat-down and search of the *inside* of the Appellant's jacket. See note 2, supra.

Given the particular facts here, Officer Barnette's conduct constituted an invasion of S.J.'s person beyond the permissible

"frisk" of the outer clothing of a suspect's apparel under *Terry,* supra, not only because there was no information obtained by the police giving them reasonable cause to believe that criminal activity was afoot, but, viewed in light of the antecedent deficiency of the "stop", the subsequent "frisk" was tainted as well. *Terry,* supra, 392 U.S. at 29–30, 88 S.Ct. at 1884.

For the reasons herein stated, we find the court below erred in refusing to grant the Appellant's motion to suppress.

Order reversed.