J-A12008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| SHAUN JACKSON, | |
| Appellee | No. 1678 EDA 2015 |

Appeal from the Order Entered May 19, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0012272-2014

BEFORE:  BENDER, P.J.E., PANELLA, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED SEPTEMBER 16, 2016**

This is the Commonwealth's appeal from the trial court's order granting Appellant's motion to suppress evidence seized from, and statements made by Appellee, Shaun Jackson.  After careful review, we affirm.

The trial court summarized the pertinent facts as follows:

> Officer Brian Smith testified that on October 11, 2014, at approximately 11:13 [p.m.], he and his partner, Officer Dill, toured the area of the 3400 block of Kensington Avenue in a marked police vehicle.  They were in the area in response to a radio call for [a reported] theft at the location of 1127 East Tioga Street, which is one block away from 3400 Kensington Avenue. Officer Smith testified that originally the flash information was for a Hispanic male wearing a black hoodie and black pants who allegedly broke into a vehicle at 1127 East Tioga Street.  Two minutes later, after another unit arrived at the location, the

_____

[*] Former Justice specially assigned to the Superior Court.

Officers received supplemental information from the owner of the vehicle that it was actually a black male, approximately 28 years old with a beard, wearing all black. Five minutes later, as they were heading towards East Tioga Street, the Officers merely observed the back of [Appellee] walking alone on the 3400 block of Kensington Avenue. Officer Smith testified that [Appellee] was a black male and wore a black hooded jacket, black sweatpants, and black sneakers.[1]

> [1] On the … [r]eport[] prepared by Officer Dill, [Appellee] was described as wearing a **black hat**, black hooded jacket, and black pants.

Officer Dill stopped the marked police car, and both Officers, in full uniform, exited and approached [Appellee], one on each side. Officer Smith asked [Appellee] if he could speak to him for a minute and [Appellee] complied. Officer Smith then explained to [Appellee] that he is being "detained" for an alleged theft and asked for his identification. [Appellee] was fully cooperative and further complied with the Officers. When Officer Smith asked if [Appellee] had anything on his person that should be of concern, [Appellee] responded that he had a firearm on his person. Officer Dill recovered a Davis Industries .32 caliber handgun, loaded with seven live rounds of ammunition, inside a sock from the right rear of [Appellee]'s pant pockets. He also recovered additional four rounds of live ammunition in [Appellee]'s ID pouch. Complainant did not positively identify [Appellee] at the scene. Yet, the Officers placed [Appellee] under arrest for possession of firearm.[2]

> [2] Officer Smith testified that [Appellee] was a convicted felon and was not permitted to carry a handgun.

Suppression Court Opinion (SCO), 8/27/15, at 2-3 (citations omitted, emphasis in original).

Following his arrest, Appellee was charged with carrying a firearm without a license, 18 Pa.C.S. § 6106; person not to possess a firearm, 18 Pa.C.S. § 6105; possessing a firearm with an altered manufacturer's number, 18 Pa.C.S. § 6110.2; and carrying a firearm in public in

Philadelphia, 18 Pa.C.S. § 6108. Following a suppression hearing held on May 8, 2015, the lower court issued an order on May 19, 2015, granting Appellee's motion to suppress his statement to police and the seized contraband.

On May 28, 2015, the Commonwealth filed the instant interlocutory appeal challenging the suppression court's order, preemptively filed a Pa.R.A.P. 1925(b) statement that same day, and also certified that the suppression order had terminated or substantially handicapped the prosecution. The suppression court issued its Rule 1925(a) opinion on August 27, 2015.

The Commonwealth now presents the following question for our review:

> Where police received a report from a known citizen that she had seen a man breaking into her car and then found [Appellee], who matched the description of the perpetrator, only one block away from the crime scene walking alone on the street late at night, did the lower court err in ruling that the police did not have reasonable suspicion for an investigatory stop?

Commonwealth's Brief, at 4.

Our standard and scope of review is as follows:

> When reviewing an Order granting a motion to suppress we are required to determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn by the suppression court from those findings are accurate. **Commonwealth v. Mistler**, 590 Pa. 390, 912 A.2d 1265, 1268 (2006), citing **Commonwealth v. Davis**, 491 Pa. 363, 421 A.2d 179 (1980). In conducting our review, we may only examine the evidence introduced by appellee along with any evidence introduced by the Commonwealth which

- 3 -

remains uncontradicted. *Id.* at 1268–1269. Our scope of review over the suppression court's factual findings is limited in that if these findings are supported by the record we are bound by them. *Id.* at 1269, citing *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 842 (2003). Our scope of review over the suppression court's legal conclusions, however, is plenary. *Id.*, citing *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 881 (1998).

*Commonwealth v. Henry*, 943 A.2d 967, 969 (Pa. Super. 2008).

Initially, we must resolve a factual dispute. In its primary analysis of the Commonwealth's claim, the suppression court acted under the assumption that the police responded to an anonymous call. However, the Commonwealth asserts that the police did not confront Appellee based exclusively on an anonymous tip—while the initial flash information was based on an anonymous call, a second radio call went out prior to the encounter with Appellee, which indicated that the owner of the vehicle subjected to the attempted theft (hereinafter "Victim") had been directly contacted. The Victim provided the police with a revised description of the perpetrator, as well as the suspect's direction of travel. The suppression court's opinion acknowledges this fact; however, the court asserts that the parties' failure to object when the court initially summarized its findings of fact on May 19, 2015, suggests that it did not err when it analyzed the stop of Appellee as if it had been solely based on an anonymous call.

We agree with the Commonwealth. The record clearly dovetails with the Commonwealth's description of the facts. *See* N.T., 5/8/15, at 11 (Officer Smith's testifying that the initial call was augmented with

- 4 -

information provided by the owner of the vehicle, providing the suspect's direction of travel and a modified physical description). Furthermore, the suppression court fails to provide any legal support for the notion that the parties' failure to object to its findings of fact consequently curtails our review of the actual record. Moreover, the suppression court never states that it found Officer Smith's testimony not credible. Instead, it appears as if the court merely misapprehended the record when it announced its findings of fact when granting the suppression motion. Indeed, the factual summary provided by the court in its Rule 1925(a) statement, above, acknowledges that the initial call was anonymous, but that additional information was received directly from a known source, the Victim.

Nevertheless, the suppression court provided an alternative analysis in its Rule 1925(a) opinion, in which the court assumed a known source while still concluding that the stop of Appellee was made absent the requisite reasonable suspicion. SCO, at 8-9. Accordingly, we will only consider the court's alternative analysis in addressing the Commonwealth's claim, as well as the aspects of the court's primary analysis that do not expressly or implicitly rely on the Victim's anonymity.

We begin with a summary of the pertinent law:

[I]n assessing the lawfulness of citizen/police encounters, a central, threshold issue is whether or not the citizen-subject has been seized. Instances of police questioning involving no seizure or detentive aspect (mere or consensual encounters) need not be supported by any level of suspicion in order to maintain validity. Valid citizen/police interactions which constitute seizures generally fall within two categories, distinguished

according to the degree of restraint upon a citizen's liberty: the investigative detention or **Terry**[1] stop, which subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest; and a custodial detention or arrest, the more restrictive form of permissible encounters. To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion; *see Commonwealth v. Lewis*, 535 Pa. 501, 508, 636 A.2d 619, 623 (1994) (citation omitted); whereas, a custodial detention is legal only if based on probable cause.

*Commonweatlh v. Strickler*, 757 A.2d 884, 889-90 (Pa. 2000) (footnote omitted, citation omitted).

Instantly, there is no dispute among the parties and the suppression court that Appellee was "seized" for purposes of the Fourth Amendment. Furthermore, the issue at hand is narrowly framed as to whether the police possessed reasonable suspicion to stop Appellee in furtherance of their investigation into the theft/attempted theft of the Victim's vehicle. In that regard:

An investigatory stop, which subjects a suspect to a stop and a period of detention but does not involve such coercive conditions as to constitute an arrest, requires a reasonable suspicion that criminal activity is afoot. **Terry**[,] 392 U.S. [at 21]; **Commonwealth v. Melendez**, 544 Pa. 323, 676 A.2d 226, 228–30 (1996). Reasonable suspicion depends upon both the content of the information possessed by the police and its degree of reliability. **Commonwealth v. Wilson**, 424 Pa.Super. 110, 115, 622 A.2d 293, 295–96 (1993) (quoting **Alabama v. White**, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990)). Thus, quantity and quality of information are

_____

[1] **Terry v. Ohio**, 392 U.S. 1 (1968).

considered when assessing the totality of the circumstances. ***Id.***
If information has a low degree of reliability, then more
information is required to establish reasonable suspicion. ***Id.***

***Commonwealth v. Wimbush***, 750 A.2d 807, 811 (Pa. 2000).

We acknowledge that Fourth Amendment jurisprudence recognizes that anonymously supplied information is inherently less reliable than information received from a known source. ***See e.g., Adams v. Williams***, 407 U.S. 143, 146-47 (1972) (observing that a tip from an informer known to the police carried enough indicia of reliability for the police to conduct a ***Terry*** search/stop, even though the same tip from an anonymous informant would likely not have done so). Therefore, by the same logic, we recognize that information garnered from a known source is more reliable than information deriving from an anonymous one. However, we are aware of no authority which suggests that the presence of a known source of information automatically results in reasonable suspicion to conduct a ***Terry*** stop. The nature of the source is but one of many possible factors which inform the totality-of-the-circumstances test for reasonable suspicion. Furthermore, it is not enough that that a person matches the description of an informant, "there must [also] be reasonable suspicion of criminal conduct[.]" ***Commonwealth v. Hawkins***, 692 A.2d 1068, 1070 (Pa. 1997).

Here, the suppression court did not grant suppression premised solely, or even primarily, on inaccuracies in the description provided by the Victim. The court acknowledged that Appellee "partially fit the general description of a black male wearing a black hooded jacket and black sweatpants." SCO, at

- 7 -

8.  We find this assessment to be fairly accurate. The correlation between Appellee and the description provided was neither exceptionally weak nor exceptionally strong, although our view is that it tended toward the former. Appellee's race and clothing matched the description, as did his direction of travel. However, no particularly unique characteristics were provided by the Victim's description, such as, for instance, the perpetrator's height or weight, whether he was a light- or dark-skinned black male, or whether he had short or long hair.[2] The Victim did not describe the presence or absence of tattoos, scars, or any other physical markings. The clothing described was accurate as to color, but wearing all-black clothing is not particularly unique, and the style of the clothing described was very general. Surprisingly, although the Victim told police that the perpetrator had a beard, Officer Smith never mentioned whether Appellee had a beard.

Given this relatively general description, the heart of the suppression court's ruling was whether there was any corroboration that criminal activity was afoot. Although dealing with an anonymous tip, the **Hawkins** Court discussed the relationship between an accurate description and the evidence of criminal conduct, as follows:

---

[2] Although the Victim described the perpetrator as wearing a hooded-jacket, which could have made it difficult to identify certain features, the information provided did not include whether the suspect was wearing the hood over his head.

If the police respond to an anonymous call that a particular person at a specified location is engaged in criminal activity, and upon arriving at the location see a person matching the description but nothing more, they have no certain knowledge except that the caller accurately described someone at a particular location. As the United States Supreme Court observed in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), *the fact that a suspect resembles the anonymous caller's description does not corroborate allegations of criminal conduct*, for anyone can describe a person who is standing in a particular location at the time of the anonymous call. Something more is needed to corroborate the caller's allegations of criminal conduct. The fact that the subject of the call was alleged to be carrying a gun, of course, is merely another allegation, and it supplies no reliability where there was none before. And since there is no gun exception to the *Terry* requirement for reasonable suspicion of criminal activity, in the typical anonymous caller situation, the police will need an independent basis to establish the requisite reasonable suspicion.

*Hawkins*, 692 A.2d at 1070–71 (emphasis added).

Instantly, there was only a bald accusation that an attempt had been made to break into the tipster's vehicle. However, there is no evidence in the record that the police verified the alleged criminal conduct by an investigation of the vehicle, or even through further discussions with the Victim. There was only the assertion that someone had attempted to break into a car, and we have no information regarding what, if anything, was stolen, or even whether the theft was interrupted. The chance of a prank report is certainly lessened by the fact that the tipster was not anonymous in this case. *See Adams,* 407 U.S. at 146-47 (recognizing greater reliability from a known source as opposed to an anonymous one because there is a lesser risk of a false complaint). However, there is no evidence in the record

that the Victim in this case was previously known to the police, another relevant factor concerning the reliability of known informants, as discussed in **Adams**. **Id.** at 146. Moreover, because there was no corroboration of criminal activity, it is also possible that the Victim was simply mistaken in his observations. Such unintentional conduct is not deterred because the tip is from a known person rather than an anonymous call.

Similarly, there was nothing about Appellee's conduct or appearance that corroborated the allegation of criminal conduct. Appellee was, by all accounts, fully compliant with the police when stopped. Although his direction of travel was consistent with the tip, Appellee was not observed to be engaged in flight from the scene, nor were there any other observations made by the police consistent with evasive behavior. Appellee was not observed carrying any instruments of crime consistent with the intent or ability to break into a vehicle. The suppression court concluded that, in the totality of these circumstances, the police lacked reasonable suspicion to stop Appellee.

We agree. Given the conflicting descriptions, the relatively generic, revised description and, most importantly, the absence of any corroboration of the alleged crime (which was not described with any degree of specificity in the first instance), we agree that the police lacked reasonable suspicion to stop Appellee.

The Commonwealth believes that a contrary result is compelled by relevant case law. However, we conclude that the cases cited by the

Commonwealth are distinguishable on both the facts and procedural postures of those cases. For instance, in ***In re D.M.***, 727 A.2d 556, 558 (Pa. 1999), a juvenile defendant appealed an adverse ruling by a suppression court, under the following facts:

> [O]n June 6, 1995, at approximately 8:40 p.m., Officer Walter Williams of the Philadelphia Police Department was on routine patrol on the west end of 30th Street and Grays Ferry Avenue when he received a radio call regarding several black males involved in a robbery at 22nd and South Streets. The officer responded to the call and immediately proceeded to the location of the reported robbery. Approximately one or two minutes after receiving the call, a short distance from the crime scene, the officer observed appellant and three other black males walking north "very quickly" on 22nd Street. They were the only individuals in the vicinity. As the officer looked in the direction of the four individuals, they immediately changed their direction. The officer conducted an investigatory stop of appellant and his companions.

***Id.*** at 557.

Our Supreme Court affirmed the suppression court's holding that the police possessed reasonable suspicion to stop the juvenile defendant, D.M. Notably, while the physical description provided in ***D.M.*** appears even more general than in the instant case, it was buttressed by the fact that multiple black males were observed committing the crime, and D.M. was found in the presence of multiple other black males near the crime scene. However, ***D.M.*** is also distinguishable, as is relevant to the instant case, because D.M. and his cohorts were observed engaging in evasive behavior, walking "very quickly" away from the crime scene, and changing direction when they saw

- 11 -

the police, thereby corroborating the suspicion that they had recently been engaged in criminal activity.

The Commonwealth further argues that Appellee's failure to engage in suspicious or unreasonable conduct does not "vitiate the reasonableness" of Officer Smith's actions, citing ***Commonwealth v. Prengle***, 437 A.2d 992 (Pa. Super. 1981). Commonwealth's Brief, at 12. In that case, an officer received flash information that a burglary had just been committed at a tire company, and that the suspect would be driving a truck loaded with tires and bearing the logo of the tire company. Upon receiving that information, the officer in ***Prengle*** drove to an exit ramp serving the area near the tire company's location, where he observed a truck, loaded with tires, and bearing the logo of the tire company. The officer stopped the truck, removed the driver, and patted him down for weapons before ultimately arresting him. The ***Prengle*** Court affirmed the denial of Prengle's motion to suppress. Prengle argued that the stop was conducted without reasonable suspicion, in part because he had not engaged in unusual conduct prior to the pat-down. The Court rejected that claim, reasoning:

> The police officer's failure to observe personally appellant engaging in "unusual conduct" does not vitiate the reasonableness of the officer's action in the instant case. The facts known to the officer prior to the frisk in question show that a crime of violence was reported, and, within minutes of the reported crime, the officer saw a moving vehicle matching the exact description of the stolen truck in the vicinity of the crime. Under these circumstances, we will not ignore the probable existence of danger and require that the officer first ask for identification prior to conducting a protective frisk.

*Prengle*, 437 A.2d at 994–95.

Unlike what occurred in *Prengle*, the observations made just prior to detaining Appellee did nothing to corroborate the allegation of criminal conduct in this case. Appellee met a very general description[3] which included a direction of travel. By contrast, in *Prengle*, the identifying information leading to the stop itself corroborated the alleged criminal conduct, as Prengle was stopped while driving a vehicle which bore the logo of the burglarized business, and which contained the stolen cargo. Thus, not only was the vehicle description in *Prengle* significantly more precise than the generalized description given in this instant case,[4] it also corroborated the alleged criminal conduct by its very nature. Here, however, Appellee was not seen carrying any stolen items or instruments of crime, nor was he observed behaving suspiciously so as to suggest a guilty mind. Thus, *Prengle* does not support reversing the suppression order in this case.

The Commonwealth also relies on *In the Interest of S.D.*, 633 A.2d 172 (Pa. Super. 1993), another case affirming the denial of a suppression motion. In *S.D.*, police received a report that two black males were armed

_____

[3] Here, we afford the Commonwealth some leeway, as the Victim reported that the perpetrator wore a beard, and there is no evidence of record that Appellee matched that aspect of the provided description, despite it being a rather unmistakable characteristic.

[4] As noted above, the *Prengle* Court stated that the stopped vehicle was an "exact" match to the description given in the flash police bulletin.

and in possession of illegal narcotics at a specific location (which was also an area known for drug trafficking). Soon thereafter, police found the defendant and his cohort, both black males, standing exactly where reported, at 5:25 a.m. In affirming the denial of suppression, this Court emphasized that S.D. and his cohort were found exactly where described by a known informant, in a high drug crime area, and at an unusual time. Here, Appellee's location was not nearly as specific (he was merely travelling in the same direction as the report indicated), it was not an unusual hour (approximately 11:20 p.m.), and there is there is nothing in the record indicating that he was found in an isolated[5] or high crime area. Moreover, there is no indication that Appellee was the only person on the street that evening. When asked if there were any other people on the street when they stopped Appellee, Officer Smith stated "I can't recall." N.T., 5/8/15, at 19. Thus, *S.D.* is also inapposite.

Finally, the Commonwealth relies on *Commonwealth v. Cruz*, 21 A.3d 1247 (Pa. Super. 2011), another case where this Court affirmed the denial of a suppression motion. In *Cruz*, "Philadelphia police received a radio dispatch to be on the lookout for a 'Hispanic male driving an older model green, small vehicle.'" *Id.* at 1248. The report came from a known victim, who had a gun pulled on her by the suspect. Within one minute of

---

[5] Indeed, the area surrounding the address of the reported theft appears to be a densely populated, urban area in North Philadelphia.

the flash bulletin, an officer observed a vehicle matching that provided by the radio dispatch, stopped that vehicle, and the driver was soon thereafter identified by the crime victim at the scene.  While the *Cruz* case is not as easily distinguished, we note that the vehicle description in that case was more specific and/or unique than the description of Appellee in this case (the officer in *Cruz* noted that Cruz's vehicle immediately stood out), and Appellee was stopped in this case a minimum of seven minutes after the initial report, whereas the police stopped Cruz within a minute of receiving the flash information.

Procedurally, too, these cases are distinguishable because they affirmed the denial of suppression in a lower court, whereas here, the suppression court granted suppression.  The applicable legal standard is the same: a court examines the totality of the circumstances to determine if there is reasonable suspicion that criminal activity is afoot.  However, it is contrary to the applicable legal standard to check off particular facts in establishing reasonable suspicion, as if such facts or circumstances should be afforded equal weight in all circumstances and in all cases.  Naturally, individual courts will afford different weight to circumstances in any given case as compared to another arising out of different conditions, above and beyond the credibility assessments of the witnesses which will also vary case-by-case.  Thus, we must recognize the discretion of the suppression court to afford certain facts different weights in the myriad of different circumstances that occur in the real world because, otherwise, we would

effectively be replacing a totality of the circumstances test with a bright-line rule. Moreover, an appeal from an order granting suppression places the burden of persuasion on the Commonwealth, whereas in the many cases cited by the Commonwealth, the burden of persuasion on appeal was on the defendant.

Given these considerations and the specific circumstances of this case, we are simply not convinced that the suppression court erred in granting Appellee's suppression motion, as we ascertain no clear legal error in that decision based on the relevant case law. Appellee only matched a general description provided by the Victim. While Appellee was observed moving in the general direction identified in the flash report, he was not located in an isolated or high crime area. There was nothing otherwise unusual about him walking in that area at that time of day, and nothing in the record demonstrates that Appellee was alone on the street when found at least seven minutes after the initial report.[6] Moreover, nothing about Appellee's

_____

[6] **See** N.T., 5/18/15, at 18 (indicating that the initial report was dispatched at 11:12 p.m., and that Appellee was stopped at 11:19 p.m.). Appellant was located approximately one city block from the scene of the alleged crime. However, it is common sense that, even moving at a leisurely pace, the average person can cover far more ground in seven minutes than a single city block. And this assumes, of course, that the victim called the police while the crime was still in progress, and that the flash information was instantaneously dispatched when received from the victim. However, it is far more reasonable to assume that there was at least some delay between the observation of the alleged criminal conduct by the Victim and the time when dispatch was able to provide the initial flash report. Thus, seven minutes is the bare minimum time that the perpetrator had to travel
*(Footnote Continued Next Page)*

behavior indicated a guilty mind. He was not moving quickly or engaged in outright flight, and he was fully cooperative with the police. Consequently, in these circumstances, we conclude that the Commonwealth has not met its burden to demonstrate a clear misapplication of the applicable law. Thus, we affirm the lower court's order granting Appellee's suppression motion.

Order *affirmed*.

Judge Panella joins this memorandum.

President Judge Emeritus Stevens files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2016

---

*(Footnote Continued)*

away from the scene of the crime. Consequently, Appellee's proximity to the scene of the crime when stopped by Officer Smith is not particularly suspicious, especially given the time of day and the fact that this was an urban environment. In *Cruz*, by contrast, the time elapsed between the initial bulletin and the police's observation of Cruz's vehicle was only one minute.